## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

**HOWARD L. BAXTER,**

     **Plaintiff,**

**vs.**                             **Case No.  5:12-CV-203-CAS**

**CAROLYN W. COLVIN,**[1]
**Acting Commissioner of Social Security,**

     **Defendant.**

_____/

## MEMORANDUM OPINION AND ORDER

This is a Social Security case referred to the undersigned United States

Magistrate Judge upon consent of the parties and reference by Chief United States

District Judge M. Casey Rodgers.  Doc. 10.  *See* Fed. R. Civ. P. 73; 28 U.S.C. § 636(c).

After careful consideration of the entire Record, the Court reverses the decision of the

Commissioner and remands the case for further consideration.

## I.  Procedural History of the Case

On February 13, 2008, Plaintiff, Howard L. Baxter, filed a Title II application for a

period of disability and Disability Insurance Benefits (DIB) and a Title XVI application for

Supplemental Security Income (SIS) alleging disability beginning February 9, 2008.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on
February 14, 2013.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure,
Carolyn W. Colvin is substituted for Michael J. Astrue as the Defendant in this case.

R. 13.  (Citations to the Record shall be by the symbol "R." followed by a page number that appears in the lower right corner.)  Plaintiff's date last insured, or the date by which his disability must have commenced in order to receive DIB under Title II, is March 31, 2012.  R. 13.

Plaintiff's application was denied initially on May 9, 2008, and upon reconsideration on November 3, 2008.  R. 13.  On November 13, 2008, Plaintiff requested a hearing.  R. 13.  On July 15, 2010, in Panama City, Florida, Plaintiff appeared and testified at a hearing conducted by Administrative Law Judge (ALJ) Morton J. Gold, Jr.  R. 13, 34-56.  William M. Jenkins, a certified rehabilitation counselor and an impartial vocational expert, testified during the hearing.  R. 13, 27, 29, 57-63, 145-47 (Resume).  Plaintiff was represented by David E. Evans, an attorney.  R. 13.

On August 24, 2010, the ALJ issued a decision and denied Plaintiff's applications for benefits concluding that Plaintiff was not disabled from February 9, 2008, through the date of the ALJ's decision.  R. 20.  On September 9, 2010, Plaintiff requested review of this decision, which the Appeals Council denied on April 24, 2012.  R. 1-9.  The ALJ's decision stands as the final decision of the Commissioner.

On June 28, 2012, Plaintiff filed a complaint with the United States District Court seeking review of the ALJ's decision.  Doc. 1.  The parties filed memoranda of law, docs. 11 and 12, which have been considered.

## II.  Findings of the ALJ

In the written decision, the ALJ made several findings relative to the issues raised in this appeal:

1. Plaintiff "meets the insured status requirements of the Social Security Act through March 31, 2012."  R. 15.

2. Plaintiff "has not engaged in substantial gainful activity since February 9, 2008, the alleged onset date."  R. 15.

3. Plaintiff "has the following severe impairments: right shoulder bursitis; depression; and alcohol abuse."  R. 15.

4. "[Plaintiff] does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  R. 16.

5. "[Plaintiff] has the residual functional capacity [RFC] to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except he is a person whose right shoulder bursitis limits him to performing medium exertional work activities[.]  He can individually sit, stand, walk, push and/or pull for at least six of eight hours each eight-hour workday.  He can lift/carry 50 pounds occasionally (up to 1/3 of an eight-hour workday) and 25 pounds frequently (up to 2/3 of an eight-hour workday).   He can individually climb ladders, ropes, or scaffolding and crawl for no more than 1/3 of an eight-hour workday. His depression and alcohol abuse may cause his concentration to drift for up to 1/3 of an eight-hour workday if the work is repetitive, routine, or boring; however, he can pay enough attention to details to meet the general productivity requirements of the job(s) within the same workday.  Even though, [sic] his pace might be disrupted once or twice a week, he will still be able to perform assigned tasks by the end of the same workday.  Although he may be late going to work or returning from a scheduled work break by up to 15 minutes per time and it will occur once or twice a week, he will still complete assigned tasks within the same workday."  R. 17-18.

6. "[Plaintiff] is capable of performing past relevant work as a *saw mill laborer* (D.O.T. # 669.687-010) which is medium/SVP2 work; *tube bender* (D.O.T # 709.687-050) which is light/SVP2 work (medium to heavy as performed); and *janitor* (382.664-010) which is medium/ SVP3 work.  This work does not require the performance of work-related activities precluded by [Plaintiff's RFC]."  R. 20.

7. Plaintiff "has not been under a disability, as defined in the Social Security Act, from February 9, 2008, through the date if this decision."  R. 20.

## III. Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by

substantial evidence in the record and premised upon correct legal principles.

42 U.S.C. § 405(g); <u>Chester v. Bowen</u>, 792 F.2d 129, 131 (11th Cir. 1986). "Substantial

evidence is more than a scintilla, but less than a preponderance. It is such relevant

evidence as a reasonable person would accept as adequate to support a conclusion."

<u>Bloodsworth v. Heckler</u>, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); <u>accord</u>

<u>Moore v. Barnhart</u>, 405 F.3d 1208, 1211 (11th Cir. 2005). "The Commissioner's factual

findings are conclusive if supported by substantial evidence." <u>Wilson v. Barnhart</u>, 284

F.3d 1219, 1221 (11th Cir. 2002) (citations omitted). The court may not reweigh the

evidence or substitute its own judgment for that of the ALJ even if it finds that the

evidence preponderates against the ALJ's decision. <u>Moore</u>, 405 F.3d at 1211.[2]

"In making an initial determination of disability, the examiner must consider four

factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining

physicians; (3) subjective evidence of pain and disability as testified to by the claimant

and corroborated by [other observers, including family members], and (4) the claimant's

age, education, and work history.'" <u>Bloodsworth</u>, 703 F.2d at 1240 (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the

claimant is not only unable to do past relevant work, "but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work

---

[2] "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." <u>Phillips v. Barnhart</u>, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted). "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." <u>Tieniber v. Heckler</u>, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" <u>Cowart v. Schweiker</u>, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1509 (duration requirement). Both the "impairment" and the "inability" must be expected to last not less than 12 months. Barnhart v. Walton, 535 U.S. 212 (2002). In addition, an individual is entitled to DIB if she is under a disability prior to the expiration of her insured status. *See* 42 U.S.C. § 423(a)(1)(A) and (d); Torres v. Sec'y of Health & Human Servs., 845 F.2d 1136, 1137-38 (1st Cir. 1988); Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).

The Commissioner analyzes a claim in five steps. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v).

1. Is the individual currently engaged in substantial gainful activity?

2. Does the individual have any severe impairments?

3. Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4. Does the individual have any impairments which prevent past relevant work?

5. Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits. A positive finding at step three results in approval of the application for benefits. At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work. Consideration

is given to the assessment of the claimant's RFC and the claimant's past relevant work. If the claimant can still do past relevant work, there will be a finding that the claimant is not disabled. If the claimant carries this burden, however, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy in light of the claimant's RFC, age, education, and work experience. Phillips, 357 F.3d at 1237; Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. §§ 404.1520(a)(4)(v), (e) & (g), 416. 920(a)(4)(v), (e) & (g). If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

## IV. Legal Analysis

### A. Issues

Plaintiff argues the ALJ erred when he did not find Plaintiff's 1975 Weschler Intelligence Scale for Children's scores in the 50s and 60s a severe impairment, which, according to Plaintiff, also satisfied Listing 12.05 and would have justified a finding of disability. Doc. 11 at 10-15. Plaintiff also argues that the ALJ erred by determining that his cardiovascular disease was nonsevere even though he had a previous heart attack, an abnormal EKG, numerous complaints of chest pain and an left ventricular ejection fraction of 32%. Doc. 11 at 15-16.[3]

---

[3] During the Social Security application process, Plaintiff was not able to read the paperwork so his niece helped him. R. 46. Plaintiff claimed that several illness, injuries, or conditions limited his ability to work such as: back, right shoulder, heart problem, pain in legs, inability to do heavy lifting, trouble comprehending things, and depression. R. 18. He stopped working on February 9, 2008, because of pain in his right shoulder; he could hardly lift anything. R. 231. In function reports, Plaintiff claimed

The Commissioner responds, in part, that Plaintiff did not meet his burden at step two to prove that his cardiac condition and level of intellectual functioning each qualified as a severe impairment and the ALJ did not err in determining that Plaintiff did not have an impairment or combination of impairments that met or equaled Listing 12.05. Doc. 12 at 5-17.

After reviewing the relevant evidence, the ALJ determined at step two that Plaintiff had three severe impairments: right shoulder bursitis, depression, and alcohol abuse. R. 15. The ALJ found these impairments were severe "because they have more than a minimal effect on [Plaintiff's] ability to do basic work activities, as indicated by the medical evidence addressed later." R. 15.

At step two, the ALJ also determined that Plaintiff's other impairments were non-severe, such as back pain, his use of inhalers, and prior surgery for carpal tunnel syndrome. R. 15-16. The ALJ found Plaintiff suffered no "functional limitations resulting from [Plaintiff's] GERD, hyperlipidemia, and cyst removal from the right jaw and, and they do not meet the duration requirement and are deemed nonsevere." The ALJ found "[n]o "A" criteria are present from posttraumatic stress disorder, and it is therefore found to be nonsevere." R. 16. Plaintiff does not take issue with these and the prior findings.

---

to have pain in his legs, back and shoulder. He expressed that he had many conditions that limited his various abilities, including understanding, following instructions, inability to count money, inability to read, and others. *See, e.g.*, R. 239-44; *see also* R. 251-52 (back, shoulder, leg, and chest pain); 256 (pain down both legs); 257 (inability to read or follow instructions); 268 (right shoulder more painful and more depressed); R. 303 (condition worse; legs, back, and hand (had surgery and told nerve damage) keep him up every night). He also advised that he attended Coldwater community schools in Michigan from 1963 to 1976, that he had been in special education programs throughout, and completed the tenth grade. R. 237, 242, 244. Being a lay person, it is understandable that Plaintiff did not expressly mention his 1975 and prior test scores or the narrative explanation of the results by Mr. Culp. R. 455-58.

Relevant here, the ALJ also considered Plaintiff's allegations of chest pains that resulted from heart problems and found them not medically determinable. As noted, "[w]hile [Plaintifff] reports taking nitroglycerin for chest pain, his cardiac work-up was negative (Exhibit 19F/24-[R. 490]). No functional limitations result from varicose veins and they are found to be nonsevere." R. 16.

The ALJ at step two also made specific findings regarding Plaintiff's childhood I.Q. scores and some of the results of Dr. Horvat's psychological consultative examination as follows:

> The rule out finding of mild mental retardation made during [Dr. Horvat's] consultative examination (Exhibit 13F) is contradicted by the claimant's work history and current outpatient psychotherapy treatment notes reflecting he is estimated to have normal intellectual functioning and ability to care for himself (Exhibit 21F/9). The 1975 school IQ scores (Exhibit 17F) in the 50's to mid 60's (the reason for him receiving Title 16 benefits in the past) are also negated by his current ability to function in, at least, the borderline range of intelligence having worked as a convenience store clerk and on a production line at a factory.

R. 16; *see* 425-28, 455-58 (report of Jeffrey L. Culp, a school psychologist, regarding test scores and narrative explanation and recommendations).

An impairment or combination of impairments is considered severe only if it significantly limits the claimant's physical or mental abilities to do basic work activities. 20 C.F.R. §§ 404.1521(a), 416.921(a); Social Security Ruling (SSR) 85-28. "Basic work activities" means "the abilities and aptitudes necessary to do most jobs" including physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, hearing, or handling; capacities for seeing, hearing, speaking; understanding, caring out, and remembering simple instructions; use of judgment; responding appropriately to supervision, coworkers and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b)(1)-(5), 416.921(b)(1)-(5).

At this step, Plaintiff has the burden of showing that his cardiac condition and level of intellectual functioning each qualified as a severe impairment.  *See* Hale v. Bowen, 831 F.2d at 1011.  Plaintiff did not meet his burden of proving that his cardiac condition qualified as a severe impairment.  For the reasons stated in Point C, *infra*, the ALJ erred in not determining that Plaintiff's intellectual functioning, such as a childhood finding of "mildly mentally impaired" and 1975 I.Q. scores, qualified as a severe impairment and further erred in not considering and determining whether the I.Q. scores and other factors met or equaled Listing 12.05.

**B.  Substantial evidence supports the ALJ's finding at step two that Plaintiff's cardiovascular condition was not a severe impairment.**

Substantial evidence supports the ALJ's finding that Plaintiff did not have a severe cardiovascular condition.  R. 16.  On February 14, 2006, Plaintiff was admitted at Borgess Medical Center (Borgess) in Kalamazoo, Michigan, for right and left heart catheterization and coronary angiography.  R. 329.  Plaintiff reported "a 2 month history of some exertional and rest discomfort pressure sensation with radiation to the arm.  The patient was referred for myocardial perfusion imaging study.  On the exercise portion, a target heart rate was not achieved.  Ejection fraction was 43% without wall motion abnormalities."  R. 329.  It was noted that Plaintiff smoked approximately one pack of cigarettes per day for many years.  It was noted that upon physical examination, Plaintiff was well-developed and in no distress with blood pressure at 110/70 and pulse at 76.  Plaintiff was prescribed Lisinopril and Atenolol.  R. 329.  (A July 12, 2007, patient note at Borgess indicates that the "[c]ardiac catheterization was essentially unremarkable."  R. 324.)

In July 2007, Plaintiff reported having left-sided chest pain while at the grocery store.  R. 323; *see* R. 310-13 (Fountain Clinic Patient notes).  He told his girlfriend who brought him to the Oaklawn Emergency Room where he was evaluated and transferred to Borgess and admitted on July 12, 2007.  Upon transfer, Plaintiff "still had some mild bearable sharp pain but otherwise stable."  R. 323.  It is noted that Plaintiff "gets short winded with exertion.  Otherwise, the rest of system review is unremarkable."  R. 324.  Plaintiff was "in no acute distress when seen."  An EKG "showed sinus rhythm, otherwise unremarkable tracings."  R. 324.  The noted impressions were: chest pain with atypical features, rule out myocardial infarction; hypertensive heart disease; and smoker.  R. 323.  Plaintiff had a stress test on July 13, 2007, for unstable angina.  R. 320-22.  It was noted, in part, that notwithstanding an ejection fraction of 32%, R. 320, the results were:

> Stress was judged to be adequate.  Stress had a normal ST response.
> Chest pain did not occur.
>
> LV myocardial perfusion was normal.  LV myocardial perfusion was consistent
> with 0 vessel disease.  Global LV function was normal.  LV regional wall motion
> was normal.
>
> Scan significance was normal and indicates a very low risk for hard cardiac
> events.  [S]mall non anatomical defects probably artifact.

R. 321.

Beginning in and around January 25, 2008, Plaintiff received medical care at Washington County Health Department (Health Department).  R. 343, 389.  One handwritten note says "MI 7/6/07."  R. 398, 507.  At this time, Plaintiff complained of shoulder pain with an assessment of bursitis vs. tendonitis.  R. 343; *see* R. 338-342 (January 29 through March 6, 2008, patient notes of shoulder pain, out of work, and

being admitted for drinking binge); R. 395 (June 6, 2008, patient note reporting "chest pain that gets worse," without shortness of breath).

On February 18, 2008, Plaintiff filed his applications requesting DIB and SSI benefits. R. 13.[4] On April 14, 2008, at the request of the Social Security Administration, Sam R. Banner, D.O., performed a medical examination of Plaintiff. R. 364-76. Plaintiff's chief complaints were chronic low back pain; pain radiating into both legs and bilateral leg weakness; inability to sit, stand or walk for prolonged periods; difficulty sleeping; chest pain at rest and shortness of breath at rest and with physical exertion; problems with his right shoulder; and nerve damage in his right hand. R. 364. Dr. Banner's diagnoses were: chronic low back pain; hypertension; shortness of breath; right shoulder and right hand pain; and a notation-"? Prior MI by history." R. 367. (In a February 5, 2008, patient note from Life Management, Plaintiff described his three MI's as "mild." R. 335.)

On December 12, 2008, Plaintiff was admitted to Northwest Florida Community Hospital complaining of chest pains for about one week; coughing for one month--just a coughing fit that sometimes sent him doubled over and trying to catch his breath. R. 491. He was placed on telemetry. Plaintiff "does have a history of old [MI] about one year ago, but he has not followed up with a cardiologist secondary to insurance problems. The patient is currently unemployed at this moment." R. 491. It is noted that Plaintiff

> does not have this chest pain on a normal basis ever since his heart attack about one year ago, but he has not been followed up by the cardiac doctor. Denies any

---

[4] On February 5, 2008, Plaintiff began treatment at the Life Management Center of Northwest Florida, Inc., Crisis Stabilization Unit (Life Management), in Panama City, Florida. R. 334. Plaintiff's mental health treatment is discussed more fully under Point C, *infra*.

fever or chills.  He has this chronic smoker's cough; on top of that, he has had a cough for about the last month.  Denies any black or bloody stools.  The rest of the Review of Systems is negative.

R. 491.

The assessment included abnormal EKG with history of an old MI; chronic obstructive pulmonary disease; chronic tobacco use; history of carpal tunnel; coronary artery disease; hypertension; and depression.  R. 491.  A chest X-ray revealed normal heart size; clear lungs; osseous structures intact; and no acute disease.  R. 496.

Plaintiff was discharged on December 13, 2008.  R. 490.  Plaintiff's cardiac enzymes were negative.  He was told to follow-up with his primary care doctor at the Health Department and to ask for a referral to a cardiologist, although Plaintiff said he probably would not be able to go because he lacked funds.  Plaintiff was also told to stop smoking tobacco; Plaintiff said he would think about it.  It was lastly noted: "[t]he chest pain is more musculoskeletal nature at this moment."  R. 490.  On discharge from the hospital, Plaintiff was not placed on any restrictions--the "normal activity" box has an "x" marked under activity.  R. 502.

Plaintiff continued receiving medical treatment at the Health Department in 2009 and 2010. R. 467-79, 531-36.  He complained of chest pain in February, March, and April 2009, although it went away after taking "nitro."  R. 477-78.

At step two, as noted above, the ALJ considered Plaintiff's complaints of chest pains resulting from heart problems, but found them not to be "medically determinable."  Plaintiff's use of nitroglycerin for chest pain was also noted as was the negative cardiac work-up.  R. 16, 490.  Dr. Banner's April 14, 2008, consultant examination is not to the contrary.  R. 364-67; *see* R. 19 (additional findings regarding Dr. Spanner's

examination).  Also, at least as of December 13, 2008, while noting an abnormal EKG,

Plaintiff's cardiac enzymes were negative and it was noted that Plaintiff did not report

having chest pain on a normal basis since his heart attack over one year prior and that

his chest pain "is more musculoskeletal in nature at this moment."  R. 490.  Ultimately,

treating physicians and other treating medical sources have not concluded that Plaintiff

suffers from a significant heart ailment that would restrict his ability to work.  Substantial

evidence supports the ALJ's determination not to include a cardiovascular impairment in

Plaintiff's list of "severe" impairments.

> **C.  The ALJ erred in determining that Plaintiff's Weschler Intelligence Scale for Children's scores in the 50s and 60s area are not a severe impairment and, in addition, erred in not considering and determining whether Plaintiff's scores met or equaled Listing 12.05.**

Plaintiff argues that the ALJ erred in not determining that his Verbal I.Q. score,

Performance I.Q. score, and Full Scale I.Q. score (I.Q. scores) qualify as a severe

impairment and also erred in not considering and determining that Plaintiff's I.Q. scores

met or equaled Listing 12.05, 20 C.F.R., Part 404, Subpart P, Appendix 1.  Doc. 11 at

11-15.  Plaintiff's arguments are well-taken.

Plaintiff was born on March 1, 1958.  R. 451.  Records from Coldwater High

School reveal that Plaintiff was a special needs student.  R. 451-61.  In and around

November 6, 1975, at age 17 and in the eleventh grade, R. 455, Plaintiff was referred to

a school psychologist, Mr. Culp, for a psychological re-evaluation because Plaintiff was

receiving special education services.  R. 455.  Mr. Culp provided Plaintiff's test scores,

including the Wechsler Intelligence Scale for Children, for 1965, 1969, and 1975.

R. 455-56.  The 1975 test scores were: Verbal I.Q.-62; Performance I.Q.-51; and Full

Scale I.Q.-52.  Wide Range Achievement Test scores were: Word Recognition Grade

Placement-2.8; Arithmetic Grade Placement-5.3; and Spelling Grade Placement-4.0.

R. 456.[5]

Mr. Culp provided his behavioral observations of Plaintiff; an explanation of the

test results; and recommendations.  R. 457-58.  Mr. Culp found that Plaintiff

> is a *mildly mentally impaired* individual who is limited in his ability to grasp and
> comprehend basic academic and cognitive information.  His actual academic
> achievement is fairly good considering his intellectual abilities.  In the area of
> Reading, Howard is functioning at about what one would expect considering his
> ability; while in Arithmetic, he is functioning considerably above his ability level.
> Howard does show some specific difficulties in the area of visual-spatial
> relationships.
>
> The examiner recommends that Howard continue in the Educable
> Mentally Impaired Program, with primary emphasis being placed in developing
> some technical trade or skill that he can find employment with.  Some care is
> needed in this area due to the fact that Howard does have difficulties in spatial
> relationships and would not necessarily be successful in many potential
> vocational training programs that could be developed for him.  The possibility of
> Howard finding employment in a sheltered workshop setting should also be
> considered, should other options fail to materialize for him.  Should Howard
> acquire employment within the community setting, the examiner would strongly
> recommend that the Special Education Dept. follow-up upon his performance
> and provide him with the support and encouragement that would be needed.

R. 458 (emphasis added).

Plaintiff did not finish high school or return to school for his GED.  R. 35.  Plaintiff

cannot read or write.  R. 36.  He believes a family member would have to help him read

a newspaper.  He has a hard time adding and subtracting change, like that given to him

at a store.  R. 36-37.  His family helped him fill out the Social Security applications.

R. 37, 46.

---

[5] "IQ test results obtained at age 16 or older should be viewed as a valid
indication of the child's current status, provided they are compatible with the child's
current behavior."  20 C.F.R., Pt. 404, Subpt. P, App. 1, Listing 112.00D.10.

On the other hand, as found by the ALJ, Plaintiff reports having no problems with personal care; is able to do yard work using a riding mower; has a driver's license and is able to drive, although he asked for instructions when he drove to the hearing. R. 16. Plaintiff's "past work history indicates he is able to get along with the public, coworkers, and supervisors" and Plaintiff "confirmed this by telling the consultative examiner [Dr. Horvat] he had no problems with his last job." R. 17, 426. Plaintiff reported that he talks to friends and plays cards or board games with them once or twice a week. R. 17. The ALJ determined that Plaintiff had *mild* difficulties in daily activities and social functioning. R. 16-17.

Also at step three, the ALJ found that Plaintiff had *moderate* difficulties regarding concentration, persistence, or pace based on the social and daily activities found by the ALJ. R. 17. The ALJ states:

> However, his treatment records [from Life Management] indicate he suffers from some depression because he has not gotten his disability yet and has a lot of bills. He has been diagnosed with an alcohol induced mood disorder and been assessed with a GAF [Global Assessment of Functioning] scores ranging from 54-60 after beginning treatment and reportedly stopping alcohol consumption (Exhibit 21F)[R. 335, 521-28]. This is consistent with a moderate level of impairment.

R. 17.[6]

---

[6] The American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) (4th Ed. Text Revision 2000), includes the Global Assessment of Functioning (GAF) Scale that is primarily used by mental health practitioners. The GAF Scale is used to report "the clinician's judgment of the individual's overall level of functioning" (with regard to only psychological, social, and occupational functioning) and "may be particularly useful in tracking the clinical progress of individuals in global terms, using a single measure." *See* DSM-IV-TR 32-34. The GAF scale is divided into 10 ranges of functioning, each with a 10-point range in the GAF scale. *Id. See* <u>Nichols v. Astrue</u>, Case No. 3:11cv409/LC/CJK, 2012 U.S. Dist. LEXIS 119347, at *26-29 (N.D. Fla. Aug. 7, 2012) (discussing GAF scale). A GAF scale rating of 41-50 is indicative of serious symptoms or any serious impairment in social, occupational or school functioning. *Id.* A GAF scale rating of 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.

At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R., Part 404, Subpart P, Appendix 1.  R. 16-17.  In making this determination at step three, the ALJ considered the criteria of Listings 12.04 (affective disorders) and 12.09 (substance addiction disorders).  R.16.  The ALJ did not expressly consider the criteria of Listing 12.05 (mental retardation), although he considered Plaintiff's I.Q. scores in conjunction with other medical evidence and Plaintiff's daily activities and behavior at step two.  R. 16.  *See generally* Popp v. Heckler, 779 F.2d 1497, 1500 (11th Cir. 1986); Henderson v. Astrue, 401 F.App'x 449 (11th Cir. 2010).

In addition to what the ALJ found in this case under step two and in order to determine Plaintiff's RFC, the ALJ commented further on Plaintiff's mental status by referring to mental health treatment records from Life Management.  R. 18-19.  Plaintiff's evaluation and treatment at Life Management began on February 5, 2008, when he was referred through the Chipley Emergency Room.  R. 335.  Plaintiff was working for ABC fencing at the time.  R. 335.  Plaintiff had been on a drinking binge and told his sister he wanted to die, but had no intention or plan.  She took him to the ER and he was Baker Acted.  A physical examination revealed normal, regular rate heart rhythm and normal breathing sounds and no edema.  Plaintiff said he wanted to return to work and live with his sister.  He also said he was depressed.  Plaintiff was assigned a GAF score of 20 on admission and 40 on discharge.  R. 334, 336.

---

*Id.*  The "Commissioner has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs,' and has indicated that GAF scores have no 'direct correlation to the severity requirements of the mental disorders listings.'"  Wind v. Barnhart, 133 F. App'x 684, 692 n.5 (11th Cir. 2005) (citing 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000)).

On July 8, 2008, Plaintiff had a psychiatric diagnostic interview at Life Management. R. 526-28; *see* R. 411-12 (June 11, 2008, mental status examination at Life Management). He is reported as a recovered alcoholic. He was diagnosed as alcohol induced mood disorder with depression; mild disorder secondary to general medical condition; and assigned a GAF score of 48. As noted by the ALJ, Plaintiff's "*mental status is consistently described as normal except for some depression*. Immediate memory is described as fair, recent memory as fair to poor, and remote memory as fair. He is oriented to time, person, place, and situation, and judgment and insight are good. (Exhibit 21F/9)." R. 19; *see* 527.[7]

By August 5, 2008, Plaintiff was reported compliant with medication, Malozicam and Lisinopril, and assigned a GAF score of 60. R. 19, 525. On November 25, 2008, Plaintiff was reported feeling "down in the dumps because of his sons' birthdays in November and he can't see them." R. 523. Holidays also make him more depressed. R. 523. He reported being denied disability. "He has had some suicidal ideation but nothing serious. No homicidal ideation. Mental status is normal, except for as mentioned here." R. 532. Plaintiff's adherence was "good." His GAF score ranged from 52 to 55. R. 523. Plaintiff's last reported visit at Life Management occurred on February 17, 2009, having missed his last appointment. R. 521. He reported being in the hospital at Chipley in December 2008 with chest pain. His mental status was reported as "normal, except for some depression because he hasn't got his disability yet

---

[7] Plaintiff told the ARNP Gibson that he was in special classes for slow learners in school; that he has to reread things in order to comprehend them; that he interrupts very often; and that he tends to be hyper talkative. ARNP Gibson noted that "[h]e did not display any of that today." R. 526.

and has a lot of bills.  No suicidal or homicidal ideation."  R. 521.  Plaintiff's adherence is

"good," except for missing his last appointment.  R. 521.  His GAF score was 54.

R. 521.[8]

In October 2008, Dr. Horvat performed a psychological consultative examination.

R. 19, 425-28.  The ALJ summarized Dr. Horvat's findings.

> Dr. Horvat found claimant was alert but distractible, and anxiety interfered with his concentration.  His memory was limited; mood and affect were noted to be depressed.  He seemed to be preoccupied with pain.  Judgment was poor, reality testing was distorted, and his illness appeared to be his main stressor.  He provided diagnoses of *rule out* mild mental retardation and dementia NOS; posttraumatic stress disorder; pain disorder; and dysthymia.  Claimant was found to not be able to handle his own finances.

> Based on the lack of objective test results, inconsistancy [sic] with the claimant's treating medical health provider's notes, and inconsistency with his past work history, this opinion is provided only little evidentiary weight.  However, it is reflected, to some degree, in the above residual functional capacity with the inclusion of moderate limitations in the claimant's mental work-related capabilities in the area of concentration, persistence, and pace.

R. 19; *see* 425-28.

As noted above, the ALJ gave significant weight to Plaintiff's past work history at

steps two and three and when he determined Plaintiff's RFC.  R. 16-17, 19-20.

From 1977 (two years after Mr. Culp's report, R. 455-58) to 1986, Plaintiff's

earnings were less than $10,000, except in 1984 when his earnings were $10,033.45.

R. 185, 188.  In and around February 28, 1986, Plaintiff was *awarded DIB* until the

benefits were terminated in December 1997.  R. 227.  His earnings during this period

were meager, and in 1992, 1994-1996, no earnings are reported.  R. 185.

---

[8]  The ALJ also stated: "As for the opinion evidence, the treatment notes from the Life Management Center have been afforded significant evidentiary [sic] since they are based on a longitudinal relationship with the claimant and are consistent with the rest of the credible evidence. "  R. 19; *see* 20 C.F.R. §§ 404.1520a(c)(1), 416.920a(c)(1).

From 1997 to 1999, Plaintiff worked in a convenience store, stocking coolers, sweeping and mopping floors, and acted as a cashier but for only about a week because he had trouble counting change. He also made food, pizza and hot dogs. R. 42, 232; *see* R. 185, 188 (earnings for 1997 ($2,702.91); 1998 ($13,159.80); and 1999 ($13,704.38)). (In 2008, Plaintiff was advised if he worked and earned over $940.00 gross per month he would not be eligible for Social Security Disability benefits. R. 159.)

From approximately 1999 to April 2004, Plaintiff worked in a factory, making shelving for freezers--called an "end bender." R. 40, 232; *see* R. 185 (earnings for 1999 ($13,704.38); 2000 ($20,347.21); 2001 ($17,459.29); 2002 ($23,346.35); 2003 ($22,248.45); 2004 ($7,237.65). (It appears Plaintiff worked in an automotive parts business as a sorter in 2005 working two days a week and had earnings in 2005 of $6,081.34. R. 39, 232. He also had earnings in 2006 of $1,023.88. R. 185, 188.) He explained: "I was on the end of a spot welder. And there was something like a little table. And the shelves would come out of the spot welder and they'll slide down. I'll take and use a scratcher or something to see if there was [sic] any loose wires or anything." He would take off the burrs or the loose wires and inspect them; after knocking off any loose wires, they went to repairs. He had to stack them and take them to repairs by himself. R. 40-41. He also stated that he roughly had to carry more than around 40 pounds--they were on a pallet and he would get someone to move it with a forklift. R. 41.

Plaintiff testified that he worked in a saw mill from approximately March 2007 until February 2008. He made ("[j]ust putting together") fences and built wooden crates

and used a nail gun.  He did not stain or paint the boxes or fences.  Parts of the fence

may have weighed more than about 20 pounds.  He did not supervise anyone.  He did

not have trouble getting along with his co-workers and supervisors; he "just went off to

an area by [himself]."  R. 38-39, 55, 232; *see* R. 185 (earnings for 2007 ($7,670.56) and

in 2008 ($1,388.00).  Plaintiff had no earnings in 2009 and 2010.  R. 185, 188.

Plaintiff alleged disability beginning February 9, 2008.  R. 13.

On April 1, 2008, Thomas Conger, Ph.D., a State agency psychological

consultant, provided a Psychiatric Review Technique (PRT).  R. 346-59.  He did not

opine that Plaintiff has an impairment that met any Listing, including Listing 12.05.

R. 350.  In his consultant's notes, Dr. Conger does not refer to any of Plaintiff's I.Q.

scores or to Dr. Horvat's October 7, 2008, report.  R. 358; *see* R. 360-63 (Dr. Conger's

April 1, 2008, Mental Residual Functional Capacity Assessment).

On November 1, 2008, Jane Cormier, Ph.D., a State agency psychological

consultant, provided a second PRT.  R. 429-42.  She did not opine that Plaintiff has an

impairment that met any Listing, including Listing 12.05.  R. 433, 441.  In her

consultant's notes, Dr. Cormier does not refer to any of Plaintiff's I.Q. scores or to

Dr. Horvat's October 7, 2008 report.  R. 441; *see* R. 360-63 (Dr. Cormier's November

11, 2008, Mental Residual Functional Capacity Assessment).

> Generally, the claimant meets the criteria for presumptive disability under section
> 12.05(b) when the claimant presents a valid IQ score of 59 or less, or under
> section 12.05(c) when the claimant presents a valid IQ score of 60 through 70
> inclusive, and when the claimant presents evidence of an additional mental or
> physical impairment significantly affecting claimant's ability to work.  *See Lowery
> v. Sullivan*, 979 F.2d 835, 837 (11th Cir.1992) (a valid IQ score need not be
> conclusive of mental retardation, where the IQ score is inconsistent with other
> evidence in the record concerning the claimant's daily activities and behavior).

<u>Crayton v. Callahan</u>, 120 F.3d1217, 1219-20 (11th Cir. 1997). "An ALJ should consider whether the results of an I.Q. test are consistent with the other medical evidence and the claimant's daily activities and behavior." <u>Henry v. Barnhart</u>, 156 F. App'x 171, 173 (11th Cir. 2005) (citing <u>Popp</u>).

The claimant has the burden of proving that his impairments meet or equal a listed impairment by presentation of specific evidence of medical signs, symptoms, or laboratory test results meeting all of the specified medical criteria. <u>Sullivan v. Zebley</u>, 493 U.S. 521, 530 (1990). "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifest only some of those criteria, no matter how severely, does not qualify." *Id*.

Listing 12.05B and C provide in relevant part:

12.05 Mental retardation: Mental retardation refers to significantly subaverage general intelligence functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before the age of 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

\* \* \* \*

B. A valid verbal, performance, or full scale IQ of 59 or less;

Or

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R., Pt. 404, Subpt. P, App. 1, Listing 12.05B and C. Listing 12.00D.6.c. provides in part: "In cases where more than one IQ is customarily derived from the test

administered, e.g., where verbal, performance, and full scale IQs are provided in the

Wechsler series, we use the lower of these in conjunction with 12.05."

"If a claimant has been able to adapt in functioning after age 22, it is permissible

to find that Listing 12.05C has not been met."  Monroe v. Astrue, 726 F. Supp. 2d 1349,

1355 (N.D. Fla. 2010).  The court in Monroe explains:

> In an unpublished case, the Eleventh Circuit has recast the rule of *Popp*: to meet
> Listing 12.05(C), "a claimant must at least (1) have significantly subaverage
> general intellectual functioning; (2) have [current] deficits in adaptive functioning;
> and (3) have manifested deficits in adaptive behavior before age 22."  *Pettus v.
> Astrue*, 226 Fed.Appx. 946, 948 (11th Cir. Apr. 5, 2007) (not selected for
> publication in the Federal Reporter, No. 06-15667).  However, it has been
> pointed out that: "Listing 12.05 does not require *significant* deficits in adaptive
> functioning; it only requires that there be 'deficits in adaptive functioning initially
> manifested during the developmental period; i.e., . . . before age 22.'  20 C.F.R.,
> Part 404, Subpart P, Appendix 1 § 12.05."  *Cammon v. Astrue*, 2009 U.S. Dist.
> LEXIS 92293, 2009 WL 3245458, *11 (N.D. Ga. Oct. 5, 2009) (No. CIV. A. 3:08-
> CV-0131-JFK).

*Id.* at 1355 n.5.  Further,

> The caselaw addressing the "adaptive functioning" aspect of Listing
> 12.05C suggests that the adaptive functioning must be significantly inconsistent
> with the I.Q. score.  An ability to do simple daily activities and simple jobs is not
> enough. As noted in *Lowery*, in *Popp* the court sustained the ALJ's rejection of a
> claim of equivalency to Listing 12.05C because the claimant's I.Q. score of 69
> was "inconsistent with evidence that [the claimant] had a two-year college
> associate's degree, was enrolled in a third year of college as a history major, and
> had worked in various technical jobs such as an administrative clerk, statistical
> clerk, and an algebra teacher."  979 F.2d at 837, citing *Popp*, 779 F.2d at 1499.
> Additionally, there was evidence in *Popp* that the claimant had "tended to place
> himself in a very unfavorable light," thereby rendering the personality test scores
> (the MMPI, not the I.Q. test) invalid in the opinion of the examiner.  *Popp*, 779
> F.2d at 1498-1499, 1500.
>
> *Popp* is perhaps the strongest case for finding that an I.Q. score below 70
> does not necessarily meet Listing 12.05C.  There are several others with facts
> somewhat like *Popp*. *Bischoff v. Astrue*, 2008 U.S. Dist. LEXIS 79534, 2008 WL
> 4541118 (S.D. Fla. Oct 9, 2008) (No. 07-60969-CIV), affirmed the determination
> that Listing 12.05C was not met.  The court noted that while the claimant's I.Q.
> scores were lower than 70, the claimant had previously worked as a parts
> manager and as an automobile mechanic, jobs which required technical

knowledge and skills, and he successfully supervised other people for five years. *Id.*, at *20. There was also evidence that the claimant was "faking" his I.Q. score, and gave conflicting reports that he had finished only the sixth, or seventh, or eighth, or ninth, or tenth grades, or had a G.E.D., or had vocational training. *Id.*

*Id.* at 1355. As noted in <u>Monroe</u>, a different result was reached in

<u>Durham v. Apfel</u>, 34 F. Supp. 2d 1373 (N.D. Ga. 1998) and where the court held:

Mr. Durham's work history does not support the ALJ's implication that he successfully worked for 40 years. He had no earnings whatsoever in nine years between 1953 and 1991, and minimal earnings several other years (TR 101-102). Mr. Durham has worked primarily as a heavy laborer (TR 46). There is no evidence that these jobs are beyond the reach of a mildly retarded individual. 34 F.Supp.2d at 1380. Distinguishing *Popp*, the court said:

Unlike Mr. Popp, Mr. Durham's work experience does not include technical jobs, but jobs as a laborer. He did not teach high school algebra, he worked as a tire repairer, laborer, kitchen helper and material handler (TR 46). Mr. Durham did not go to college, he went to the fourth grade. *Id. See also Markle v. Barnhart*, 324 F.3d 182, 187 (3d Cir. 2003) ("ability to pay his own bills, add and subtract, use an ATM machine and to take care of all his own personal needs," and "ability to identify and administer his medication; his previous jobs; his obtaining a GED" were not inconsistent with a finding of mental retardation and the I.Q. scores) (citing *Brown v. Sec'y of HHS*, 948 F.2d 268, 270 (6th Cir. 1991), "rejecting the Commissioner's argument that a claimant's full scale IQ of 68 was inconsistent with, among other things, his driver's license and work history as a truck driver, limited literacy and sixth grade education, and ability to make change, do laundry, and clean his room.").

<u>Monroe</u>, 726 F. Supp. 2d at 1356-57; *see also* <u>Willis v. Astrue</u>, No. 5:12cv/RS/CJK,

2012 WL 6725605 (N.D. Fla. Nov. 26, 2012).

In this case, in 1975, while 17 years old, Plaintiff's Full Scale I.Q. score was 52

and his Performance I.Q. was 51, both under the requirements of Listing 12.05B (scores

of 59 or less). (Plaintiff's Verbal I.Q. score was 62.) R. 456. The ALJ did not find that

the test scores were invalid, only that they were negated and contradicted by Plaintiff's

work history, current outpatient psychotherapy treatment notes, and Plaintiff's "current

ability to function in, at least the borderline range of intelligence having worked as a convenience store clerk and on a production line at a factory."  R. 16.

Plaintiff's work status from 1977 until February 2008 is described above.  The ALJ did not mention Plaintiff's spotty work and low earnings from 1977 to 1986 and did not mention that Plaintiff was awarded DIB in 1986 until benefits were terminated in December 1997--a period of twenty years.  It appears that Plaintiff's Social Security benefits were terminated because he tried to work, beginning in 1998.  *See* R. 335. Notwithstanding his work in the factory, there is no evidence that Plaintiff acquired any significant technical skills; supervised, hired, or fired employees; regularly used complex machines and technical knowledge and skills, including taking measurements and making calculations; or that Plaintiff is or was a malingerer.

On the other hand, Plaintiff did not finish high school or return to school for his GED.  R. 35.  Plaintiff cannot read or write.  R. 36.  He believes a family member would have to help him read a newspaper.  He has a hard time adding and subtracting change, like that given to him at a store.  R. 36-37.  His family helped him fill out the Social Security applications.  R. 37.  Dr. Horvat noted that Plaintiff

> appeared to be of below average intelligence level, and his fund of knowledge was limited by his education and his intellect.  He was unable to do his serial sevens or his serial threes.  He could not spell the word "world" either forward or backward.  When asked to name the last five presidents, he named one of the five, and he could not name the current vice president.  When asked to name five large rivers, he named one of the five.  When asked to explain the proverb about people who live in glass houses shouldn't throw stones, he said that he did not know.  When asked to explain the proverb about a rolling stone gathers no moss, he said that he didn't know.  When asked how apples and oranges are alike, he said that "both are round and you eat them both."  When asked to explain the difference between a child and a dwarf, he said that he didn't know.  When asked, "Do you think there is something wrong with you?" he answered, "Yes, I just have trouble remembering things."  When asked, "What strengths do you think you have?" after the question was explained, he replied, "I don't know."

When asked, "Do you think you're impaired?" After the question was explained, he responded, "Yes, my legs and back." He showed no signs of delusions. He said that he does not sleep well, and he reported that he has chronic pain and "it makes it hard to sleep and/or wakes me up at night." He said that he has a good appetite, his energy level is a two on a scale of ten, and he denied any history of hallucinations. His abstraction was concrete, his judgment was poor, his reality testing was distorted, his insight was nil in his decision making was also. His illness appears to be his main stressor, and his coping ability was overwhelmed. His skill deficits are in the areas of intellect, education, and activities of daily living, and his friends are his main supports. His level of social judgment leads him to impropriety, and social maturity is impulsive.

R. 427. Dr. Horvat's diagnosis for Axis II was "R/O Mild Retardation" and noted by the ALJ. R. 19, 427. Dr. Horvat concluded: "He is not capable of handling finances. Until his levels of cognitive and mental functioning can be established, it will be difficult to recommend a treatment program." R. 428. The ALJ gave Dr. Horvat's opinion "only little evidentiary weight" "[b]ased on the lack of objective test results, inconsistancy [sic] with the claimant's treating mental health provider's notes, and inconsistency with his past work history." R. 19.

The ALJ overemphasized Plaintiff's ability to do simple daily activities and overall limited work, in comparison to the number of years when Plaintiff did not have meaningful work and was receiving DIB. Overall, the ALJ erred when he determined that Plaintiff's I.Q. scores and intellectual functioning were not a severe impairment and further erred when he did not consider and determine at step three whether Plaintiff intellectual functioning and I.Q. scores met or equaled Listing 12.05. *See* Monroe, 726 F. Supp. 2d at 1352-58. On remand, the ALJ should consider the record anew and open the record for additional evidence in order to make the required findings under steps two and three.

## V.  Conclusion

Considering the Record as a whole, the findings of the ALJ are not based upon substantial evidence in the record and the ALJ incorrectly applied the law.  Accordingly, pursuant to the fourth sentence in 42 U.S.C § 405(g), the decision of the Commissioner to deny Plaintiff's applications for Social Security benefits is **REVERSED** and this case is **REMANDED** for further proceedings consistent with this Memorandum Opinion and Order.

**IN CHAMBERS** at Tallahassee, Florida, on March 11, 2013.


s/ Charles A. Stampelos_____
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**